1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3                       SOUTHERN DIVISION

4

5    UNITED STATES OF AMERICA,      ) CRIMINAL
                                    ) NO. TDC-18-215
6              Plaintiff,           )
                                    )
7    v.                             )
                                    )
8    DEMETRIUS KEATON,              )
                                    )
9              Defendant.           )

10             TRANSCRIPT OF SENTENCING PROCEEDINGS
             BEFORE THE HONORABLE THEODORE D. CHUANG
11                UNITED STATES DISTRICT JUDGE
              WEDNESDAY, JUNE 1, 2022; 2:30 P.M.
12                    GREENBELT, MARYLAND

13   APPEARANCES:

14   FOR THE PLAINTIFF:

15             OFFICE OF THE UNITED STATES ATTORNEY
               BY:  TIMOTHY F. HAGAN, JR., ESQUIRE
16             6406 Ivy Lane
               Suite 800
17             Greenbelt, Maryland  20770
               (301) 344-4516
18
     FOR THE DEFENDANT:
19
               RAQUIN MERCER LLC
20             BY:  STEPHEN B. MERCER, ESQUIRE
               50 West Montgomery Avenue
21             Suite 200
               Rockville, Maryland  20850
22             (301) 880-9250

23
     OFFICIAL COURT REPORTER:
24   Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

25     ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

1          (Call to order of the Court.)

2               THE COURT:  Thank you, everyone.  Please be seated.

3               THE DEPUTY CLERK:  The matter now pending before this

4    Court is Criminal Action No. TDC-18-0215, the United States of

5    America vs. Demetrius Keaton.  We are here today for the

6    purpose of sentencing.

7          Counsel, please identify yourselves for the record.

8               MR. HAGAN:  Good afternoon, Your Honor.  Timothy

9    Hagan on behalf of the United States.

10              THE COURT:  Good afternoon.

11              MR. MERCER:  Good afternoon, Your Honor.  Steve

12   Mercer for Demetrius Keaton.

13              THE COURT:  Good afternoon.  Good afternoon to

14   Mr. Keaton.

15         So, before we begin, I just want to review with everyone

16   in the courtroom our current protocols.  Everyone is required

17   to keep their mask on over their nose and mouth throughout the

18   proceedings; however, if you have a speaking role and are fully

19   vaccinated, you may remove your mask during the speaking

20   portion, and I will follow that procedure myself.  Please do so

21   either at the witness stand or at the podium.

22         And for today, we are here for the sentencing in United

23   States vs. Keaton.  On February 4th, 2020, Mr. Keaton pleaded

24   guilty to a two-count superseding information charging him in

25   Count One with possession of a firearm by a convicted felon in

1  violation of 18, U.S.C., Section 922(g)(1), and in Count Two

2  with possession of a controlled substance with intent to

3  distribute in violation of 21, U.S.C., 841(a)(1).

4        I have received and reviewed the following documents in

5  connection with today's proceedings: the revised presentence

6  report, which is ECF 130, the government's sentencing memos,

7  which are ECFs 118, 128, and 131, the defendant's memos, ECF

8  117, 129, and 133, and the motion for an order of forfeiture,

9  which is ECF 73.

10        Is there anything else that was submitted?

11            MR. HAGAN:  Nothing from the government, Your Honor.

12            MR. MERCER:  No, Your Honor.

13            THE COURT:  Okay.  And I have received and reviewed

14  the presentence report.

15        And Mr. Mercer, other than the issue regarding the Armed

16  Career Criminal Act enhancement, are there any other objections

17  to it?

18            MR. MERCER:  Just minor ones, Your Honor.  First, the

19  revised PSR is still saying that he does not have a G.E.D. but

20  is also indicating that BOP records state that he has a GOP

21  (sic), they just don't have his completion date, and that is

22  because G.E.D. -- Lorton, where he got the G.E.D. has closed

23  and the records are not available, but the BOP's Century system

24  does say G.E.D.  So that is one correction.

25        And the other is the revised PSR indicates that

1    Mr. Keaton had waived his right to appeal.  He does, under the

2    plea agreement, have the right to appeal a finding under the

3    Armed Career Act or the Armed Career enhancement.

4            THE COURT:  Okay.  Any issues with those adjustments,

5    Ms. Contreras?

6            PROBATION OFFICER CONTRERAS:  Your Honor --

7            THE COURT:  Yes, go ahead.

8            PROBATION OFFICER CONTRERAS: -- in paragraph 79, it

9    does state that the defendant did get a G.E.D.  It just doesn't

10   reflect the date because we were not able to get one available

11   because the center closed.  So it doesn't state that he doesn't

12   have one.  We just couldn't confirm a date.

13           THE COURT:  Hold on a second.  Is that sufficient,

14   Mr. Mercer?  Are you looking at paragraph 79?  It seems to say

15   what you are referring to about the issue about Lorton being

16   closed and so forth.

17           MR. MERCER:  Right.  Except at the beginning of the

18   PSR, in the summary section, it indicates no G.E.D.

19           THE COURT:  Oh, I see, page 3.

20           PROBATION OFFICER CONTRERAS:  That states no high

21   school diploma or G.E.D., which states he either does not have

22   a high school diploma or he does have a G.E.D., so I think it's

23   just a misunderstanding of what that -- what that means is he

24   either has no high school diploma or he has a G.E.D.

25           MR. MERCER:  Maybe it could just be stated in the

1  affirmative that he has a G.E.D. because that is something that

2  does count towards a security score.

3              THE COURT:  I mean, it seems confusing to me.  I

4  mean, this probably is a standard templated reference, but --

5              PROBATION OFFICER CONTRERAS:  It is, Your Honor.

6  It's just a drop down that we select and that's how it always

7  shows up.

8              THE COURT:  Yes.  But this certainly implies that he

9  has neither.  So if he had one or the other, what does it show?

10  If he has a G.E.D., what would it normally show?

11             PROBATION OFFICER CONTRERAS:  If he has a G.E.D., we

12  select this, what shows up here.  I mean, I can try to override

13  it if you would prefer to.

14             THE COURT:  So it's only if he has a diploma, it

15  would say he has a high school diploma?

16             PROBATION OFFICER CONTRERAS:  Correct.

17             THE COURT:  If he has a G.E.D., it says this?

18             PROBATION OFFICER CONTRERAS:  That's correct.

19             THE COURT:  What happens if he has neither, like, he

20  has no high school diploma and no G.E.D., what does the entry

21  say?

22             PROBATION OFFICER CONTRERAS:  I would have to look,

23  Your Honor.  I don't recall off the top of my head what it

24  would state if he had neither.  If you prefer, we can make the

25  change and try to take out the no high school diploma part so

1   there is no confusion.

2           THE COURT:  Well, why don't we do that in this

3   instance.  I mean, it may be -- I don't know, but just for --

4   just resolving the issue, it's probably better just to leave it

5   as G.E.D. at that.

6           And then the other issue again, Mr. Mercer, was what?

7           MR. MERCER:  It just -- at paragraph 6 on page 4, it

8   says, The defendant agrees to waive all rights conferred by 18,

9   U.S.C., 3742.  I mean, it's not controlling, but he does have

10  the right to appeal a finding that he is --

11          THE COURT:  No.  I understand that.

12          Mr. Hagan, what do you make of that?  Is that accurate?

13  I know that the plea agreement says he -- Both sides reserve

14  the right to appeal a ruling on the ACC enhancement, so do we

15  need paragraph 6, or is there something else that should be

16  said that's different?

17          MR. HAGAN:  Your Honor, I think a modification would

18  be appropriate.  The plea agreement does note "except as

19  follows," so perhaps this can reflect "except as follows."

20          THE COURT:  Is this a direct quote from the plea

21  agreement or is this just a standard?

22          MR. HAGAN:  In 10 -- paragraph 10 of the plea

23  agreement.  On page 6, paragraph 10 "B" as in "boy."

24          THE COURT:  Hold on one second.  Well, what would you

25  propose it say?

1          MR. HAGAN:  For page 4, paragraph 6 of the PSR, The

2    defendant agrees to waive all rights conferred by Title 18,

3    United States Code, Section 3742 except the defendant reserves

4    the right, and I would track the language.

5          THE COURT:  Right.  So what if we just said "except

6    as follows" and then added the language in subparts one and

7    two?

8          MR. HAGAN:  No objection to that, Your Honor.

9          THE COURT:  Is that okay with you, Ms. Contreras?

10          PROBATION OFFICER CONTRERAS:  Yes, Your Honor.

11          THE COURT:  Mr. Mercer?

12          MR. MERCER:  Yes, Your Honor.

13          THE COURT:  So we will make those changes.

14      So on this issue of the Armed Career Criminal

15    enhancement, I understand there is some exhibits and maybe a

16    witness as well; is that correct?

17          MR. MERCER:  Yes.  I have our expert here, Mr. Ben

18    Streifel; however, as I read the papers, there is really not a

19    dispute that the 1995 Maryland statute includes a prohibition

20    against ioflupane and that the current Controlled Substance Act

21    under federal law, you know, ioflupane is lawful, so there is

22    the mismatch.  So there is not that dispute.

23      I have him available if the Court has any questions about

24    derivatives or something of that sort, but given the posture of

25    the parties, I think we are more in the midst of a legal

1    dispute over divisibility verse indivisibility.

2        THE COURT:  Mr. Hagan, what do you make of that?  Is

3    there a dispute on whether -- leaving aside the language of the

4    statute, or in terms of the -- whether the categorical approach

5    or modified categorical approach applies, whether the -- is

6    there a dispute on the defendant's argument that, under the

7    Maryland statute, this form of cocaine or related drug of

8    ioflupane is part of -- would be -- or possession with intent

9    to distribute that would be a violation of the Maryland statute

10   but not of the Controlled Substances Act?

11       MR. HAGAN:  There isn't a dispute on that specific

12   question, what the expert is going to opine to, Your Honor.

13       THE COURT:  So do you have questions for -- I mean,

14   you have seen the affidavit.  Do you have questions for

15   Dr. Streifel?

16       MR. HAGAN:  That would not -- it would entirely

17   depend upon his testimony, Your Honor, but with respect to the

18   issue, I don't think it's contested.

19       Now, if his testimony were to go broader than something

20   that's in here or something along those lines, then yes, I

21   would, but I don't have any objection necessarily to the Court

22   accepting what the statute says on its face with respect to --

23   each statute says on its face with respect to ioflupane and

24   whether or not as a result a broader category of narcotics was

25   prescribed under Maryland law in 1995 than -- than was

1  prescribed in the current federal statute.

2         THE COURT:  I mean, I do have a few questions which

3  are probably best directed to him.  I was probably going to ask

4  counsel, but it was really more about what counsel had read

5  from this and so forth.  Maybe we could have Dr. Streifel take

6  the stand for a few questions.

7         MR. MERCER:  Absolutely.

8         THE COURT:  And then counsel can follow up on those

9  questions.

10        THE DEPUTY CLERK:  Please step forward to the witness

11 stand, remain standing, and please raise your right hand.

12        BENJAMIN STREIFEL, DEFENDANT'S WITNESS, SWORN

13        THE DEPUTY CLERK:  You may be seated, sir.  Speak

14 clearly into the microphone.  Please state your first and last

15 name for the record.

16        THE WITNESS:  Benjamin Streifel, S-T-R-E-I-F-E-L.

17        THE COURT:  And for the record, Mr. Mercer, I take it

18 you are offering Exhibit 2, the affidavit of Dr. Streifel, as

19 an exhibit.  Correct?

20        MR. MERCER:  Yes, Your Honor.  And it has his C.V.

21 and qualifications along with it.

22        THE COURT:  So I will accept that as an exhibit in

23 the hearing.

24     Dr. Streifel, a few questions just to clarify things

25 relating to your affidavit or really just things related to

 1   subject matter.  If you don't know the answer, certainly let me

 2   know, but based on your expertise, it seems as if you might.

 3        So I am looking at the paragraph that comes from the

 4   Maryland statute from 1995.  Do you have a copy of the

 5   affidavit?  I don't think we need the statute.  We just need

 6   the affidavit.

 7             MR. MERCER:  Yes, Your Honor.  If I can approach?

 8             THE COURT:  Thank you.

 9             THE WITNESS:  Which paragraph was that?

10             THE COURT:  Just on the first paragraph, you quote

11   from the Maryland statute, and that uses language such as coca

12   leaves and then it gives an exception, and then it also refers

13   to cocaine, its salts, optical and geometric isomers,

14   et cetera.  It also refers to ecgonine and its derivatives.

15        Am I correct that your analysis or your conclusion is the

16   ioflupane is an ecgonine derivative.  Is that correct?

17             THE WITNESS:  Yes.  There is a sort of color-coded

18   figure on the next page that tries to --

19             THE COURT:  I see that.

20        So if that's a derivative, ecgonine, how would you

21   characterize the relationship between ecgonine and cocaine?

22   Are they two totally different drugs?  Are they related in some

23   ways, one being a derivative of the other?  Are they

24   effectively the same drug?  How would you characterize that

25   relationship?

1          THE WITNESS:  So they are different, I would say

2    derivatives fits here.  You have what we would call different

3    substitutions.  As you can see, the red portions on the cocaine

4    molecule do not exist on the ecgonine molecule to the left of

5    that.

6          THE COURT:  So when you say they are different but

7    then derivatives would be the right word, so, again, if I were

8    saying these are two totally different drugs, these are two

9    things that are closely related or they are virtually or -- or

10   functionally, they are the same?  I mean, where would you put

11   those two on the spectrum?

12         THE WITNESS:  That's a little tougher.  So very small

13   changes to a molecule can affect its interaction with the body.

14   So swapping a single atom can change how a molecule behaves or

15   it can have very little effect.  So any given change is hard to

16   read.  They are definitely not the same drug.  They are

17   structurally different.  I am not familiar with the effects of

18   pure ecgonine compared to cocaine I think we are all familiar

19   with as a regulated substance.

20         So they are derivatives and not the same drug, but they

21   are related by that core structure in green here.

22         THE COURT:  Okay.  So going back to the paragraph on

23   -- in the block quote in paragraph 1 of your affidavit, it

24   begins with "Coca leaves," would you characterize everything in

25   that paragraph as being -- that block quote as being

Sisler - Direct

```
 1   derivatives of each other, or are there some things in there
 2   that are really in a separate family or separate category of
 3   drugs than others?
 4              THE WITNESS:  Certainly coca leaves would be
 5   different.  That's the leaf itself that contains cocaine, so
 6   that's a plant material.
 7              THE COURT:  So different biologically or chemically,
 8   but they are related in some fashion?  The cocaine comes from
 9   the coca leaf?
10              THE WITNESS:  Yes.
11              THE COURT:  Do you know does ecgonine come from a
12   coca leaf or some other kind of leaf?
13              THE WITNESS:  I would imagine there is small amounts
14   that can vary between different plants and they are not all
15   exactly the same, but I am not familiar with other plants that
16   create ecgonine.
17              THE COURT:  But they do come from coca leaves as
18   well?
19              THE WITNESS:  Yes.  So ecgonine derivatives are in
20   the plant as well.
21              THE COURT:  I see.
22              THE WITNESS:  There are, of course, also synthetic
23   ones like ioflupane which would not come from there.  That is a
24   radial labelled drug.
25              THE COURT:  So ioflupane is a synthetic drug you
```

 1  said?

 2           THE WITNESS:  Or semi synthetic which may be

 3  derivatized from a natural product.

 4           THE COURT:  And then when -- so when you see the term

 5  "derivative," are you seeing something that's artificially

 6  derived from it or could be naturally derived from it?

 7           THE WITNESS:  Either.  There is no formal chemistry

 8  definition.  That's a fairly broad term.  And available

 9  definitions include sort of thought experiments, or if you

10  could perform a chemical synthesis that may not be possible in

11  real life, that would still be a derivative, so you could do it

12  on paper.

13           THE COURT:  So what about these terms used in this

14  block quote, salts, optical and geometric isomers, salts of

15  isomers, are those things the same -- are they different from

16  derivatives or are they a subset of derivatives?  How would you

17  characterize the relationship among those types of terms?

18           THE WITNESS:  Those terms are more specific than the

19  term "derivative," so salts would be in this case the reaction

20  of cocaine freebase with an acid of some kind, so you could

21  have -- cocaine hydrochloride would be a salt and that's a

22  derivative, it may imply some structural changes; whereas, the

23  salt is a slightly different formula so you don't form a strict

24  chemical bond there necessarily.

25           Isomers is different arrangements of atoms so those would

1   be derivatives, but it's a little more specific than the term

2   "derivative."

3             THE COURT:  So derivative is a broader term than

4   salts, isomers, et cetera?

5             THE WITNESS:  Yes.

6             THE COURT:  And then finally as to those things --

7   and I think I have already asked this but I just want to make

8   sure I understand it -- that cocaine, ecgonine, and ioflupane

9   are all things that come from coca leaves in some fashion?

10            THE WITNESS:  Ioflupane may if in industry they are

11  taking it from coca leaves and then modifying it.  If they, for

12  example, make it fully synthetically and I don't know, then

13  that wouldn't come from the coca leaf.

14            THE COURT:  If it's made artificially, but if it came

15  naturally, it would come from coca leaves?

16            THE WITNESS:  Yeah, if you could extract it from the

17  plant.

18            THE COURT:  Would it be fair to say that everything

19  in this paragraph or this block quote, one way to characterize

20  what this description is are various types of drugs that are

21  derived from coca leaves?  Not necessarily all drugs are

22  derived from coca leaves but that they all share that in

23  common?

24            THE WITNESS:  Almost, except derivatives could

25  include synthetically modified versions.

1          THE COURT:  Right.  Okay.

2          THE WITNESS:  So not quite.

3          THE COURT:  I understand.  So the difference, let's

4    say, between this -- these coca leaf related drugs and let's

5    say something like heroin, those are two totally different

6    categories of drugs or are they related closely as well?

7          THE WITNESS:  Those are different drugs.  They do not

8    share a core structure.

9          THE COURT:  All these share a core structure, the

10   ones that are referenced in this block quote?

11         THE WITNESS:  Yeah.

12         THE COURT:  As -- the structure that you have in your

13   graph like on page 2?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  Anyone want to follow up on those

16   questions?  Thank you very much, Doctor.

17         MR. HAGAN:  Nothing from the government, Your Honor.

18         MR. MERCER:  Nothing from the defense about that

19   topic of the cocaine related items.

20      I was just going to inquire of Dr. Streifel about the

21   definition in D.C. of marijuana in 1991 and whether it

22   prohibited hemp and whether hemp is prohibited under the

23   current federal statute, but I have no questions about the

24   matters the Court just addressed.

25         THE COURT:  Okay.  But can I just ask why does the

1    D.C. statute matter for purposes of marijuana?

2             MR. MERCER:  Because the attempt to distribute

3    conviction from 1991, we know from the D.C. Court of Appeals

4    that the specific type of drug is not an element, so it's just

5    controlled, dangerous substance, so any substance that is more

6    broadly prohibited by D.C. than the current federal statute

7    would be -- create a mismatch and --

8             THE COURT:  Which case are you referring to?  Because

9    this -- I have to admit, the -- some of the arguments on the

10   D.C. statutes came late in the process, so is that referenced

11   in your papers?

12            MR. MERCER:  Yes.  And I concede that point, Your

13   Honor.  I did raise the D.C. argument in our reply.  But I

14   think it's an important one and I think it can also resolve all

15   of the issues before the Court because the D.C. Court of

16   Appeals in *Seeny* [phonetic] and *Thomas* have said that attempt

17   distribution is -- controlled, dangerous substance is

18   indivisible.  The government --

19            THE COURT:  Right.  I know which argument you are

20   referring to.

21            MR. MERCER:  And so what I was --

22            THE COURT:  If you can ask the questions relatively

23   efficiently just so we can clear the record on this issue, go

24   ahead.

25            MR. MERCER:  Yes.

1                         DIRECT EXAMINATION

2    BY MR. MERCER:

3    Q.    Dr. Streifel, you have reviewed the D.C. Controlled

4    Substance Act applicable to 1991?

5    A.    Yes.

6    Q.    And you have looked at specifically the definition for

7    marijuana and cannabis?

8    A.    Correct.

9    Q.    And did it include hemp?

10   A.    It would have made what is now considered hemp illegal at

11   that time.

12   Q.    Okay.  "At that time" being "1991"?

13   A.    Yes.

14   Q.    And the current federal definition under the Agriculture

15   Act does make hemp lawful?

16   A.    Correct.

17             MR. MERCER:  That's all I had to ask about that, Your

18   Honor.

19             THE COURT:  Okay.  Anything you want to follow up on,

20   Mr. Hagan?

21             MR. HAGAN:  No.  Thank you, Your Honor.

22             THE COURT:  Okay.  Thank you, Dr. Streifel.  If you

23   can step down.

24         You know, I don't know what your arrangement is.  It

25   might not be a bad idea to have Dr. Streifel stay through at

1   least some portion of the hearing just in case issues arise.

2   Would that be okay?

3          MR. MERCER:  Very well.  Would you like him to remain

4   in the courtroom or out --

5          THE COURT:  I think it's okay for him to remain in

6   the courtroom unless, Mr. Hagan, do you object?

7          MR. HAGAN:  No objection, Your Honor.

8          THE COURT:  Okay.  So he is an expert witness of

9   sorts so it's probably fine.

10         So on this issue, the main objection here is the Armed

11  Career Criminal enhancement.  I will say I have reviewed the

12  briefs.  I know some arguments were being added and subtracted

13  at various times.  I wanted to see what, if anything, either

14  sides wants to add to what's already been submitted in writing.

15  Anyone have anything else you want to add?

16         MR. HAGAN:  Nothing from the government, Your Honor.

17         MR. MERCER:  No, Your Honor.  I did include all our

18  arguments.

19         THE COURT:  Okay.  I have a few questions I just want

20  to make sure I -- let me just look at my list here and see if

21  there is anything I want to cover.

22         Mr. Mercer, you make the argument on -- this is on the

23  attempt conviction about *Shular* effectively supporting the

24  notion that an attempt is not covered by the ACCA serious drug

25  offense definition.  I may have missed it, but are there any

1   Courts that have reached that conclusion yet, particularly

2   circuits or even district courts?

3          MR. MERCER:  Not since *Shular* was decided June 1st of

4   2022, Your Honor.

5          THE COURT:  Okay.

6          MR. MERCER:  I'm sorry.  That's the date I printed

7   it.

8          THE COURT:  2020 I think.

9          MR. MERCER:  2020.  I'm sorry.

10         THE COURT:  Okay.  And then a similar question to

11  your argument on the occasions piece -- and I understand,

12  obviously, that *Wooden* just came out so the parties might have

13  been looking at that -- but the argument that, under *Mathis*,

14  there has to be a jury determination of whether -- you know,

15  the facts surrounding a -- whether prior convictions were

16  committed on different occasions, is that something that a

17  Court has agreed with you on up until now?  I know the issue

18  was -- seemed to be described as left open or undecided by the

19  Supreme Court in *Wooden*, so I am assuming there aren't any

20  other cases that have reached a conclusion on that.  Is that

21  correct?

22         MR. MERCER:  Right.  We have -- we have provided the

23  Court with the *Rico Brown* brief that's pending before the

24  Fourth Circuit now.

25         THE COURT:  Right.  That hasn't been resolved yet.

1          MR. MERCER:  That has not been resolved yet.

2          THE COURT:  And then for you, Mr. Hagan, just, as

3    Mr. Mercer pointed out, he had perhaps added some arguments in

4    his reply brief.  I don't know if there is anything you want to

5    add on those.  But do you see any difference between the

6    argument on the Maryland statute and the D.C. statute in terms

7    of whether there is divisibility or not at the level of these

8    lists of cocaine-related drugs?

9          MR. HAGAN:  No distinction in that regard, Your

10   Honor.

11         THE COURT:  And then what do you make of this

12   argument under I think it's *Thompson* or *Thomas* that the -- an

13   attempt is something that does not require the type of drug as

14   an element?

15         MR. HAGAN:  Both of those cases that were cited by

16   the defense, Your Honor, were decided by the D.C. Circuit prior

17   to the two cases cited by the government in our brief out of

18   the D.C. Circuit that indicated that that offense, the attempt

19   offense is, in fact, a predicate under the Armed Career

20   Criminal -- under that statute.

21         THE COURT:  Which case are you referring to that you

22   have cited?

23         MR. HAGAN:  *Williams* was one, Your Honor.  I will

24   find it in my brief.

25         THE COURT:  Where is that in your brief just so I can

1   refresh my memory on that?  And which brief?

2          MR. HAGAN:  At page 3 of ECF 118, our sentencing

3   memorandum, we cite *United States vs. Williams*, 488 F.3d 1004

4   and 1009.  It's a 2007 case out of the D.C. Circuit.

5          THE COURT:  No.  I understand.  So I am actually

6   referring to the other argument, and, admittedly, I think it is

7   a little confusing, but I think the defense makes two arguments

8   about the attempt predicate.  One is this one, that under this

9   concept of involving, whether it's covered or not, and I agree

10  with you that most of the circuits say that it is covered, and

11  I think Mr. Mercer would agree with that and he's making a

12  separate argument about the *Shular* case.

13      The other argument seems to be that the -- there is a

14  case *Thompson vs. United States* from 1996, and they note that

15  -- they argue that as a completed crime -- or as an attempt

16  rather than a completed crime, their argument is that the

17  particular drug at issue is not an element, and I wanted to see

18  if you had a response to that argument given that, again, I

19  think it may have been raised later in the process.

20          MR. HAGAN:  What *Shular* addresses is what -- what

21  *Shular* addresses is whether or not the -- the comparison

22  between the statute that was the basis of the -- of the prior

23  conviction needs to be compared to a generic statute or whether

24  it involves conduct that's referenced in 924(e).  And what

25  *Shular* said was it's, in fact, conduct that's referenced in

1    924(e) under the serious drug offense rather than some generic

2    drug offense.

3         In order for that argument to carry weight, they are

4    indicating -- the defense is arguing that *Shular* should

5    essentially be disregarded because it requires that we prove

6    every -- that the statute hit every element, and that's exactly

7    what *Shular* rejected.  It said it does not need to hit every

8    element.  It's with respect to conduct that's referenced in

9    924(e), not every element that's referenced to some generic --

10        THE COURT:  No.  I understand that.  Again, I think

11   -- I mean, there is a school of thought that we don't even

12   consider arguments raised in reply briefs, but I am trying to

13   give the defendant the benefit of the doubt, I am trying to

14   consider it, but the argument is different, I think.  Maybe

15   Mr. Mercer can explain it, this *Thompson* argument.

16        I think the argument is not that attempt could never be a

17   predicate offense, at least under *Thompson*.  The issue is that

18   -- is whether the -- the attempt statute effectively is not

19   divisible in that it would sweep in anything -- any attempt to

20   possess with intent to distribute any controlled substance of

21   any kind, which, without having done the exact comparison, his

22   argument is that the D.C. list of controlled substances is not

23   the same as the federal one, and, therefore, there would be a

24   mismatch and it would -- the -- because there is no ability to

25   use the modified categorical approach for the attempt as

1   opposed to the substantive offense or the completed crime, that

2   would be why it would not be a predicate offense.  That's the

3   argument I am referring to, which is -- relates to the attempt

4   but it's a different argument than the *Shular* argument.

5            MR. HAGAN:  I think what our response to that would

6   be is that under the Fourth Circuit and still post *Shular*, post

7   *Mathis*, involving, while it also includes, as we have defined

8   it, necessarily entails or necessarily requires, still modifies

9   conduct that is to be described and considered broadly in the

10  subsequent -- the subsequent clause of 924(e).

11       And so while -- and so the defense is trying to sort of

12  have their cake and eat it to saying the government is limited

13  by the definition of necessarily requires, which we are, that's

14  what we have conceded, but then says, essentially, that it also

15  is limited to the elements that are set forth following the

16  word "involving," and that is not what *Shular* said.  It said

17  the opposite.

18           THE COURT:  Mr. Mercer, is this *Thompson* argument

19  related to *Shular* or is it separate?

20           MR. MERCER:  No, not at all.

21           THE COURT:  I think I understand the argument.  I was

22  just trying to give the government a chance.  They don't seem

23  to have an argument, but I understand your argument.  Thank

24  you.

25           MR. MERCER:  Yes.

1           THE COURT:  In any event, so a complicated set of

2     arguments here.  Let me see if I can make some rulings on them.

3     And we will start with this objection which is that the PSR's

4     finding that the defendant qualifies for the sentencing

5     enhancement under the Armed Career Criminal Act is incorrect

6     because at least one of the three identified predicate

7     convictions does not count as a predicate under the ACCA.

8           The first argument is that the 1995 Maryland conviction

9     for possession with intent to distribute cocaine categorically

10    fails to qualify as a serious drug offense because the

11    definition of cocaine under that statute is broader than the

12    definition under the federal Controlled Substances Act.

13          Under *Mathis vs. United States*, 579 U.S. 500, 2016, if

14    the least culpable conduct under the state statute falls

15    outside the definition of a serious drug offense, it does not

16    qualify as an ACC predicate offense.

17          As relevant here, a serious drug offense under 18,

18    U.S.C., 924(e) is a state offense that, quote, involving

19    manufacturing, distributing, or possessing with intent to

20    manufacture or distribute a controlled substance, unquote, with

21    controlled substance being defined under the Controlled

22    Substances Act.

23          In *United States vs. Hope*, 28th F.4th 487, Fourth

24    Circuit, 2022, the Fourth Circuit recently considered a similar

25    argument about a conviction for possession with intent to

1    distribute marijuana under a South Carolina statute and

2    concluded that such a conviction is not an ACC predicate

3    because the state statute included hemp as part of the

4    definition of marijuana, but the relevant federal schedule

5    excluded hemp such that there was a categorical mismatch

6    between the two drug schedules and a defendant could be

7    convicted under the South Carolina statute for conduct that was

8    not covered by the Controlled Substances Act.

9         Notably, the Court determined that even if the statute

10   were divisible by drug type, such that the modified categorical

11   approach could be used, the statute would still not qualify

12   because the definitions of marijuana do not match.

13        Now, here, the relevant Maryland statute, Article 27,

14   Section 279(b)(A)(4) from the 1995 Maryland Code barred the

15   possession with intent to distribute Schedule II controlled

16   substances and referenced cocaine as such a drug in the

17   following category of Schedule II drugs:  Coca leaves, except

18   coca leaves and abstracts of coca leaves from which cocaine,

19   ecgonine, and derivatives of ecgonine or their salts have been

20   removed, cocaine, its salts, optical and geometric isomers and

21   salts of isomers, ecgonine, its derivatives, their salts,

22   isomers, and salts of isomers, or any compound, mixture, or

23   preparation which contains any quantity of any of the

24   substances referred to in this paragraph.

25        As stated in the expert opinion of Dr. Streifel and as

1  the government does not dispute, this description established

2  that ioflupane would be covered by the statute because it is a

3  derivative of ecgonine.

4       In contrast, Schedule II of the Controlled Substances

5  Act, which similarly includes derivatives of ecgonine, hasn't

6  been interpreted under 21, C.F.R., 1308.12(b)(4) to exclude

7  ioflupane, thus, it is undisputed that there is conduct under

8  the Maryland statute that would not have constituted a

9  violation of the Controlled Substances Act.

10       Now, the government seeks to distinguish this case from

11 *Hope* by arguing that under *State vs. Simpson*, 567 A.2d 132,

12 Maryland, 1989, that the specific charged controlled substance

13 such as heroin or cocaine is an element of the offense, so

14 under the modified categorical approach, the fact that the drug

15 at issue was cocaine was an element of the Maryland offense of

16 conviction and Mr. Keaton's conviction was for an offense that

17 was a serious drug offense under the federal law.

18       *Simpson*, however, did not address the divisibility of the

19 statute among the various terms used in describing cocaine in

20 the Maryland statute.  Maryland does not have a freestanding

21 term "cocaine" in the statute; rather, the only place it's

22 referenced in the schedules is in the lengthy description of

23 substances similar to cocaine that I just recited.

24       The Court finds that within the structure of the statute,

25 this collection of terms is effectively a definition of cocaine

1  analogous to the definition of marijuana at issue in *Hope*.

2  This conclusion tracks the analysis of the Seventh Circuit in

3  *United States vs. Ruth*, 966 F.3d 642, Seventh Circuit, 2020, in

4  which the Court found nearly identical language in Illinois'

5  similarly structured schedule of controlled substances to be a

6  definition of cocaine in considering whether a particular

7  conviction could serve as a predicate offense.

8       The Court, therefore, concludes that a conviction under

9  that statute did not qualify as a felony drug offense for

10  purposes of an enhancement under 21, U.S.C., 851 even though it

11  found that the overall statute was divisible in that a

12  violation relating to a substance containing cocaine was

13  divisible from violations involving other drugs such as heroin,

14  morphine, or fentanyl.

15       Similarly in *United States vs. Fernandez-Taveras*, 511 F.

16  Supp. 3d 367, Eastern District of New York, 2021, the Court

17  identified a similar subsection of the New York code to be the

18  definition of cocaine under New York law in concluding that a

19  violation of that provision did not render the defendant

20  removable under the Immigration and Nationality Act because the

21  definition of cocaine was different than the federal

22  definition.

23       Here, the Court likewise concludes that Section

24  279(b)(A)(4) is a definition of cocaine that's broader than the

25  federal definition such that under *Hope*, a violation of the

statute is not a serious drug offense under the ACCA.  This
conclusion is informed in part by Dr. Streifel's testimony in
that all of the terms in that paragraph from the Maryland
statute are related in some fashion to each other, that they
all effectively are forms of drugs that derive from coca leaves
or -- or synthetic versions of that, and so they do group
together in the way as they do in those other statutes from
other states as a definition.

Even if not viewed as a definition, the subsection's list
of different forms of cocaine-related drugs at most identifies
different meanings rather than elements of the offense.  While
under *Simpson*, the statute is divisible at the level of the
type of drugs, such as heroin versus cocaine, it does not
follow that the statute is further divisible between the
various forms of cocaine-related drugs within subsection 4
given the structure of the statute and the fact that it ends
with a catchall term for any drug containing any quantity of
any of the listed items in that subsection.

In *Hope*, the Fourth Circuit stated that there must be
clear signals of divisibility from the state Supreme Court and
cited to *Najera-Rodriguez vs. Barr*, 926 F.3d 343, Seventh
Circuit, 2019, in which the Seventh Circuit stated that such
certainty is necessary because in finding divisibility, federal
courts could mistakenly cast doubt on the much higher volume of
state criminal prosecutions under those same state statutes.

1   To find the statute divisible within subsection 4 would be to

2   require a jury in a Maryland drug case to specifically find in

3   any cocaine case whether the specific drug was coca leaves,

4   cocaine, ecgonine, or a substance containing some quantity of

5   one of these drugs and to decide which of those terms applied.

6   There is no basis to conclude that Maryland requires such level

7   of specificity within cocaine or like substances.

8          So the Court finds that the Maryland schedule provides

9   alternatives means for a cocaine conviction but not alternative

10  elements.

11         The same conclusion was reached in *United States vs.*

12  *Holiday*, 853 Federal Appendix 53, Ninth Circuit, 2021, in which

13  the Court found that a similar subsection in a Montana drug

14  statute, Montana Code Annotated 50-32-2241(d), consisted of

15  alternative means of committing a drug crime involving cocaine,

16  not different elements in finding that a violation of the

17  statute did not constitute a predicate offense under the career

18  offender guideline.

19         The cases cited by the government do not alter the

20  conclusion.  In *Cucalon vs. Barr*, 958 F.3d 245, Fourth Circuit,

21  2020, the Court concluded that the Virginia drug distribution

22  statute is divisible by drug type akin to *Simpson's* ruling for

23  the Maryland statute, but did not reach the question of whether

24  it was further divisible by different forms of cocaine-related

25  substances.

1          In *United States vs. Jones* from the Western District of
2    Virginia in 2021, which was decided before *Hope* and was
3    interpreting that Virginia statute, which is structured
4    differently than the Maryland statute in that it separates by
5    additional subsections cocaine from things like ecgonine, and
6    it did not analyze the question of whether the statute was
7    further divisible by the kinds of subsections present in the
8    Maryland statute.

9          So because Maryland's definition of cocaine in 1995 was
10   categorically broader than the definition of cocaine in the
11   current federal schedule, and that, at most, that subsection at
12   issue provided different means but not different elements, the
13   Court finds that the 1995 Maryland conviction is not a
14   predicate serious drug offense for the ACCA enhancement.

15         Now, with that determination, it's not actually necessary
16   to address the other arguments in order to reach a ruling on
17   whether the enhancement applies.  I will, just for the record,
18   point out my determinations on the other two main theories.

19         First, on this attempted distribution, although the
20   Court's ruling on the Maryland conviction is sufficient as to
21   the attempted distribution argument under *Shular*, the Court
22   does not agree with the defense on that argument.  Mr. Keaton
23   is arguing that his 1991 conviction in the Superior Court of
24   D.C. for attempted distribution of cocaine fails to qualify as
25   a serious drug offense because the term in 924(e)(2) does not

1  include inchoate offenses like attempt, and serious drug is

2  defined as including an offense under state law involving

3  manufacturing, distributing, or possessing with intent to

4  manufacture or distribute a controlled substance.  The argument

5  is the term "involving" signifies that an attempt does not fall

6  within that definition.

7        In *United States vs. Brandon*, 247 F.3d 186, Fourth

8  Circuit, 2001, the Fourth Circuit held that based on this word,

9  there was no requirement that intent to manufacture or

10  distribute be an element of the offense and specifically

11  concluded that the word "involving" suggests that the provision

12  should be read expansively.

13        In *United States vs. James*, 834 F.2d 92, Fourth Circuit,

14  1987, the Court rejected a narrow view of the word "involving"

15  in a different statutory provision by clarifying that the

16  phrase "involving the distribution, manufacture, or

17  importation" must be read as including more than the list of

18  items and could include possession with intent to distribute.

19        Following the reasoning in *Brandon*, the Fourth Circuit

20  held in *United States vs. Williams*, 468 Federal Appendix 343,

21  Fourth Circuit, 2012, that a conviction for attempt to sell

22  cocaine was a predicate conviction under the ACCA because it

23  would have involved conduct defined as a serious drug offense.

24        Several other circuits have reached that conclusion,

25  including the Second, the Eighth, and most relevant here, the

1  D.C. Circuit in *United States vs. Williams* which held that a

2  1992 attempted distribution of cocaine conviction in D.C.,

3  apparently the same offense at issue here, was a serious drug

4  offense.

5       Now, against this authority, Mr. Keaton argues that the

6  recent decision in -- by the Supreme Court in *Shular* defined

7  involved more narrowly as necessarily requires so that a

8  serious drug offense requires the completed conduct of

9  manufacturing, distributing, or possessing with intent to

10  distribute -- possessing with intent to distribute does not

11  include an attempt.

12       First, the Court doesn't agree with that conclusion for

13  the following reasons:  First, *Shular* did not define the term

14  "involved" but instead merely relied on the parties' agreement

15  that the term means necessarily requires; second, *Shular* did

16  not address the question of whether involving allowed for an

17  attempt or another inchoate offense to be a predicate offense.

18  Rather, the Court held that this term did not require a Court

19  to determine that the state offense had elements matching those

20  of a generic offense that would be a serious drug offense.

21       In fact, by rejecting a requirement that the state

22  offense have certain elements, *Shular* ruled consistently with

23  the prior case law that I have already discussed and thus did

24  not alter the legal landscape in a way that requires revisiting

25  the Fourth Circuit precedent that an attempt can be a serious

1  drug offense under the ACCA.

2      So the Court does not find that that 1991 D.C. conviction

3  for attempted distribution is disqualified as a predicate

4  offense.

5      In the final argument, Mr. Keaton argues that application

6  of the ACCA would violate the Fifth and Sixth Amendments of the

7  Constitution because the issue of whether his three previous

8  convictions for serious drug offenses were committed on

9  occasions different from one another under 18, U.S.C.,

10 924(e)(1) was not presented to and found by a jury.

11     The Fourth Circuit has previously rejected this argument

12 in *United States vs. Thompson*, 421 F.3d 278, Fourth Circuit,

13 2005.  Mr. Keaton argues that *Thompson* is no longer applicable

14 in light of *Mathis vs. United States*, 136 Supreme Court

15 220-243, 2016.  As has been noted in the briefing, the recent

16 Supreme Court case of *Wooden* did not resolve this issue, merely

17 highlighted it hasn't yet to be resolved.

18     Now, in *Mathis*, the Supreme Court held that based on the

19 Sixth Amendment, any fact which increases the maximum penalty

20 for a crime that goes beyond the simple fact of a prior

21 conviction must be charged in an indictment, submitted to a

22 jury, and proven by a reasonable doubt -- beyond a reasonable

23 doubt, and that a judge cannot make a finding that explores the

24 manner in which the defendant committed that offense.

25     In *Mathis*, the issue was the fact of whether the location

of a previous burglary was a building or a vehicle.  The
present case is, in one sense, distinguishable in that where
Mr. Keaton's convictions occurred in 1992, 1995, and 2002, the
facts establishing separate offenses are consistent with
*Thompson*, inherent in the convictions themselves, and readily
contained in the judicial records.

Today, however, regardless of how one interprets it,
*Thompson* remains controlling authority.  There is a case that's
currently on appeal but has yet to be resolved.  The Fourth
Circuit has revisited *Thompson* on multiple occasions, including
not only in *United States vs. Span* from 2015 but most recently
in *United States vs. Daniels*, an unpublished case from 2022, in
which the Court rejected the exact argument that a jury had to
decide whether the defendant's predicate convictions occurred
on different occasions because the Court remained bound by
*Thompson*.

So because *Thompson* is still controlling authority, the
Court must reject the constitutional argument and finds that it
can and does find that the three prior convictions occurred on
separate occasions.

So that particular argument, the Court will not agree
with.

I am not going to reach the other arguments, including
the one regarding the other *Thompson* case, although I would
note that I have some skepticism about whether it is simply the

1  case that an attempt does not allow for divisibility -- or does

2  not allow for divisibility in the statute by drug type.

3       My initial reading of *Thompson* is that it's mainly

4  pointing out that for an attempt, one does not have to prove

5  that a drug is, in fact, the drug charged.  It does not tell me

6  that there doesn't need to be some intent to possess with

7  intent to distribute a particular drug.  I don't think there

8  has been sufficient briefing on that topic and analysis to

9  reach a firm conclusion.  That's where I am right now.

10       I don't need to reach that conclusion because based on my

11  analysis of the Maryland statute, as already discussed, I will

12  grant the -- or sustain the objection because we only now have

13  two predicate convictions.

14       Any questions on any of that?

15       Okay.  So based on that, overruling of that objection --

16  or granting of that -- sustaining of that objection, I do find

17  that the defendant doesn't qualify for the Armed Career

18  Criminal enhancement, so the total offense level is 24, the

19  criminal history category is III, so the guideline range is 63

20  to 78 months.

21       I will note, for the record, that I agree with the

22  presentence report's findings that to the extent, if the ACC

23  did apply, the offense level would be 32, the criminal history

24  category would be V, and the range would be 210 to 262.

25       For purposes of where we are now, though, the guideline

1   range for supervised release is one to three years on Count

2   One, three years on Count Two.  The guideline range for a fine

3   is $20,000 to $1 million.  The special assessment is $200.

4        So with all of that, why don't we discuss what the actual

5   sentence should be.  We can start with the government.  I

6   understand your broader argument.  I do have your argument in

7   your brief which certainly preserves your argument based on

8   your interpretation of the guidelines, but given where we are

9   now, I'd be interested in hearing your views.

10        MR. HAGAN:  Thank you, Your Honor.

11        And the government does request a sentence at the top of

12  the guidelines in this matter at 78 months in light of the

13  Court's ruling, not waiving, obviously, our earlier position or

14  suggesting that -- obviously recognizing the Court's ruling at

15  this time.

16        And so under those parameters, we believe that for the

17  reasons set forth in recommending a bottom of the guidelines

18  210-month sentence, that they still apply with respect to the

19  recommendation of a 78-month sentence.

20        I don't intend to belabor the point of what was made both

21  in the statement of facts as well as the -- our memorandum of

22  why this is appropriate under 3553(a).  We believe it is

23  because the defendant is an individual who, for his lifetime,

24  has been -- or at least his adult lifetime has been

25  distributing drugs, and as a result, in this case, that had

1    ratcheted up to a level where there was clear danger associated

2    with that, including the possession of firearms, body armor,

3    and the -- and the presence of narcotics in a place that would

4    be accessible to children, and there were children present in

5    his residence.  And so for those reasons, Your Honor, we do

6    believe that this is an appropriate sentence.

7         We also are mindful of the prior sentences the defendant

8    has received.  He certainly should not be surprised that he

9    would be looking at some significant prison time in light of

10   his prior record and the time that he has served in the past,

11   and we believe that 78 months is appropriate in light of the

12   guidelines that are -- that the Court has established.

13        THE COURT:  Can I just -- let's just try to confirm

14   here that we are all on the same page.  How much time has he

15   actually served to date that you would anticipate he'd get

16   credit for?  Obviously, that's not our decision, but just in

17   light of the stay with the waiting for the ruling in *Wooden*, I

18   think things got more extended than they typically do.

19            MR. MERCER:  I have some calculations if --

20            THE COURT:  What do you have, Mr. Mercer?

21            MR. MERCER:  So he was arrested on -- on the state

22   side February 14th of 2018 and held in state custody until

23   April 23rd of 2018, for a total of 69 days.  He was arraigned

24   in this Court April 23rd, 2018, and he was held until released

25   April 24th of 2020, so he was held 733 days for that period.

1   June 2nd, he was brought back and he was -- he's been held

2   until today, June 1st of 2022, for another 730 days.

3          So it's a total of 1,532 days or approximately 51 months

4   to date.

5          THE COURT:  How does that sound to you, Mr. Hagan?

6   51 months, roughly?

7          MR. HAGAN:  I have no objection to the calculations.

8   The calculations are correct.

9          THE COURT:  Okay.  And then one other question.  You

10  mentioned sort of a lifetime of drug dealing, and one of the

11  things we were discussing were these predicate prior

12  convictions or potentially predicate prior convictions.  They

13  all largely -- well, not all of them, but the possession with

14  intent to distribute charges all go back to, let's say, 2000 or

15  thereabouts.  There is a possession charge from 2010 and then

16  we just have a motor vehicle charge.

17         So what indicia are there that the drug dealing was

18  continuing during that period when you don't really have a

19  conviction other than a possession conviction in the last 20

20  years?

21         MR. HAGAN:  It was Mr. Keaton's statement to law

22  enforcement, Your Honor.  As I noted on page 6 of our

23  sentencing memorandum, Mr. Keaton told law enforcement that he

24  had dealt drugs since he was a teenager.

25         THE COURT:  Okay.  Mr. Mercer, your turn.

1          MR. MERCER:  Your Honor, I will start with the

2     criminal history, and I don't agree that the government is

3     using Mr. Keaton's statement in an appropriate way to establish

4     its point, which I think is overstated, and I think there is a

5     substantial decay factor here.

6          When you go back to these predicate convictions, the 1991

7     conviction, Mr. Keaton was 18 years old, and he was sentenced

8     by Judge Arthur Burnett of the D.C. Superior Court to eight

9     years.  And I happen to know Judge Arthur Burnett.  I actually

10    was interning as a law student in his chambers around 1993

11    right around that time.  For the life of me, I don't understand

12    --

13         THE COURT:  You don't have a conflict of interest

14    here?

15         MR. MERCER:  No, I do not.

16         THE COURT:  We could start this whole case over

17    again.

18         MR. MERCER:  No, not at all.

19         But eight years for an 18 year old on an attempted

20    distribution that sent him to Lorton.  Now, to Mr. Keaton's

21    credit, he actually earned his G.E.D. at Lorton, but the

22    conditions of Lorton were so horrendous that they all -- the

23    whole system was taken over by the federal government.  I mean,

24    that just was not an appropriate sentence, in my opinion, my

25    humble opinion, for an 18 year old at that time.

1          THE COURT:  He only served, what, two years, though?

2          MR. MERCER:  Well, here is the thing.  He did two

3    years and then he was paroled out, but that tail of parole was

4    so long, it went to 2003 which made it a scorable offense

5    because it just overlaps by a few months the 15-year lookback.

6    So it's really a peculiarity of D.C. and their parole at that

7    time where a judge, I think what's going on is they are given a

8    big number because they are figuring there is presumptive

9    parole, and he got presumptive parole at an early time.  But

10   then that parole is hanging in the background and then it has

11   this long tail, and then it hits in 2003 still when he's a

12   young man, and that's what got it scorable, but that's the

13   three points.  If you took out those three points, he's only a

14   Category II, which puts him down into a range for a Base

15   Offense Level 24, adjusted at 57 to 71 months.  The low end of

16   that is pretty close to time served.

17          And I will note, too, that the 51 months approximately

18   that he's done has been under the harshest of conditions.  I

19   mean, as Your Honor knows from the work that the Court has done

20   and the many rulings and the decision of, I think it's *United

21   States v. Merrell* that's often cited in our compassionate

22   release work, these are not ordinary conditions and ordinary

23   times to be at CDF.

24          I mean, there is a lack of programming, there is a lack

25   of movement within the facility.  It's just a lack of family

1   visiting.  Your Honor, this -- Mr. Keaton has four children,

2   young children, and the government references in their -- he

3   accepts responsibility.  He understands what he did was wrong.

4        At the same time, just to be clear, there were toddlers,

5   and the firearms in question were up on a high shelf in a

6   closet.  They were not within reach, lunge, grasp, or anything

7   of that sort.  That is not to excuse the behavior which he has

8   accepted responsibility of completely.  My point is that he has

9   a close relationship with his children.  He was staying at home

10  and caring for the children.

11       And Your Honor, I attached to our sentencing memorandum

12  last year the letter from Theola Blocker, his significant

13  other, mother of two of his children.  She's here in court

14  today, Your Honor.  But she wrote an incredibly thoughtful

15  letter, and her words really are more powerful than anything I

16  can say, but what she touches on here, and I think this is so

17  important about Mr. Keaton and I think this is directly in

18  response to what the government is portraying him as some

19  incorrigible individual, he is not at all.

20       He has had plenty of time during this pandemic and during

21  this lockdown to think about his conduct, his behavior, and how

22  this has made him not present for his children's lives.  And

23  that has impacted him in powerful ways.  It's impacted

24  Ms. Blocker.  It's impacted their children.  And the fact that

25  he recognizes that, that speaks to his character and who he is.

1   He is not this incorrigible individual.

2        He is someone who is on a different path at the age of 49

3   not to be back in the criminal justice system or this courtroom

4   on this type of offense.  Yes, he has challenges to face

5   economically, although I note if you look at his child support

6   payment, I mean, he's almost current with that.  So he has --

7   he has shown responsibility to matters that are of importance

8   to him and taken, you know, appropriate action.

9        Your Honor, you know, I have spent the past year working

10  with Mr. Keaton on these issues of tremendous importance to him

11  and we very much appreciate the Court's ruling that -- I mean,

12  for him to come into a sentencing and either be looking at 15

13  years or, you know, very different guidelines has just put an

14  awesome amount of pressure on him and really gotten him focused

15  on what this day is all about and what his hopes are in terms

16  of the Court's sentence.

17       I am asking for a sentence, Your Honor, that would

18  effectively allow him to be released.  I think it's that time.

19  I think he has been punished appropriately given the nature and

20  circumstances of -- of the offenses at issue.  He's not a

21  violent man.  And I don't believe he's -- he poses a threat or

22  a danger to the community.  I think it's time for him to go

23  home to his family after this long stay in prison for these

24  offenses which he accepts responsibility for and he

25  acknowledges his wrongful conduct and he's very remorseful

1   about.

2          Thank you, Your Honor.

3          THE COURT:  Okay.  Thank you.

4      Mr. Keaton, you have the opportunity if you would like to

5   to make a statement before the sentence is issued.  If you'd

6   like to, now is the time.  Just stand up and pull the

7   microphone straight up.

8          THE DEFENDANT:  Can you hear me?

9          THE COURT:  Yes, I can.

10          THE DEFENDANT:  Yeah.  I am not a real big public

11   speaker, but it's been hard.  Right?  I made a few mistakes,

12   you know what I'm saying?  But I have missed my kids.  And I am

13   at the age now where, what can I say, like, I can't even see

14   myself, like, doing -- like committing crimes no more because,

15   like, I am too old, I got kids, and I'm just to the point where

16   I would just like to go home and get a job and spend time with

17   my kids, you know?  And like I said, I take all responsibility

18   to what I have done, but I am done.  I just can't -- this is

19   not -- this is not me no more, you know what I'm saying?  I am

20   done.

21          THE COURT:  Thank you.

22      So in considering the appropriate sentence for

23   Mr. Keaton, I have considered the advisory guideline range as

24   calculated today.  I have also considered all the factors in

25   18, U.S.C., 3553(a), including the nature and circumstances of

1   the offense, the history and characteristics of the defendant,

2   and the need to meet the purposes of sentencing.  I have also

3   considered Congress' direction that the sentence imposed be

4   sufficient, but not greater than necessary, to comply with the

5   purposes of sentencing.  I will discuss some but not all of

6   those factors in detail.

7        On the nature of the offense, this is a case involving

8   guns and drugs found at the defendant's residence where there

9   were children present.  This is a serious offense.  At the same

10  time, there is no evidence the guns were actually used in a

11  drug deal or in a violent event.

12       So as a matter of the facts of this case and the types of

13  similar cases in which these charges are brought, the case is

14  not at the most serious end in which there is large scale drug

15  dealing, potentially violent acts, guns being used in the

16  course of specific transactions.  It is less serious than that,

17  yet still a serious offense.

18       As for the history and characteristics of the defendant,

19  Mr. Keaton has an extensive criminal record, but that but for

20  the technical issues that we discussed today would have

21  qualified him for the 15-year mandatory minimum under the Armed

22  Career Criminal Act.  So he does have a long history as a drug

23  dealer regardless of whether that enhancement applies.

24       It is true that his drug distribution offenses are all in

25  the range of 20 years or older and they appear to be based

1   primarily on street-level dealing, and so it's a fair point to

2   raise as to how much of that activity continued since those

3   convictions.  I accept the government's argument or statement

4   that he acknowledged being a drug dealer since being a

5   teenager.  That, by itself, I don't think would be enough to

6   reach a conclusion about what had been going on in the last 20

7   years or so, although it is noteworthy that he has no

8   significant employment history, so over the last 20 years,

9   whether it was drug dealing or otherwise, he was somehow

10  finding a means to at least subsist.  Regardless, though, what

11  we have is a record with multiple drug distribution

12  convictions, but they are dated.

13       What's more I think relevant here, though, is he has no

14  violent convictions and no violent crime of convictions and he

15  has no firearms-related convictions.  These drug dealing

16  offenses and convictions tend to focus only on the drug

17  distribution issue, which is serious, but, again, other

18  defendants sometimes have a broader combination of violent

19  convictions and gun convictions, and that's not what we have

20  here.

21       At the time of Mr. Keaton's arrest, he was in a stable

22  personal relationship and he had relationships with his four

23  children, so these are all mitigating factors.  In light of the

24  serious drugs at issue, the guns, the presence of children at

25  the residence, as well as the defendant's long history of drug

1  dealing, even if it may have been more focused in the early

2  part of his life, and without any clear evidence establishing

3  that the drug dealing was effectively involuntarily the result

4  of a personal drug addiction, the Court will not depart

5  downward, which I think is what the defense's recommendation

6  would require, to a sentence of time served or thereabouts.

7       I do conclude that any guideline sentence is appropriate

8  to reflect the seriousness of the offense, to promote respect

9  for the law, to provide just punishment, and to provide

10 adequate deterrence.

11      There has been a reference to the harsh conditions that

12 exist both within the BOP generally and more specifically in

13 pretrial detention as a result of the COVID-19 pandemic.  On

14 the one hand, I should note that, to a large degree, the fact

15 that Mr. Keaton was in those conditions was, in my view,

16 self-imposed.  As we may recall, he was released at least some

17 point into his detention but that release was revoked based on

18 failure to comply with conditions.  So, to some degree, the

19 argument is limited in the sense that he could have, with

20 different decisions, ended up on release during this period.

21      Nevertheless, given not just the difficult conditions

22 that exist in our pretrial detention facilities but also will

23 be more difficult in the next short-term period during which

24 the pandemic continues, hopefully short-term period, I do

25 recognize that time being served nowadays is different than

1  time being served generally.  So while I was considering a

2  high-end sentence, as the government has recommended, I will

3  make it more of a mid-range sentence to reflect the factors

4  that I have just described.

5        And so I will impose a sentence of 72 months to be

6  followed by three years of supervised release.  I do think that

7  is sufficient to reflect the seriousness of the offense, to

8  promote respect for the law, to provide just punishment, and to

9  provide adequate deterrence.

10        I will note for the record, to the extent it matters to

11  someone reviewing the record later, that if the ACC enhancement

12  had applied, I would have varied downward to a sentence of 180

13  months because the nature and circumstances of this offense,

14  the age and nature of the drug convictions, the lack of any

15  violent firearm convictions would make the guideline range of

16  210 months or above more than necessary to meet the purposes of

17  sentencing, so I will make that finding for the record.

18        But now I will impose the sentence in this case.

19  Mr. Keaton, if you could please stand.  In the case of United

20  States vs. Keaton, the Court sentences the defendant as

21  follows:  On Count One, felon in possession of a firearm, and

22  Count Two, possession with intent to distribute controlled

23  substances, the Court sentences you to a term of imprisonment

24  of 72 months on each count with sentences to run concurrently,

25  to be followed by three years of supervised release on both

1    counts with both the sentences and the terms of supervised

2    release to run concurrently.  I will impose no fine.  You are

3    required to pay the special assessment of $200.

4          The standard and statutory conditions of supervised

5    release are set forth in the presentence report and I won't

6    repeat them unless you or your attorney ask me to do so.

7          I will recite specifically the special conditions of

8    supervised release.

9          These include, first, that you submit to substance abuse

10   testing to determine if you have used a prohibited substance.

11   You must not attempt to obstruct or tamper with the testing

12   methods.

13         Second, you must participate in a substance abuse

14   treatment program and follow the rules and regulations of that

15   program and the probation officer will supervise your

16   participation in that program.

17         You must participate in a vocational services program and

18   follow the rules and regulations of that program, which may

19   include job readiness training and skills development training.

20         And you must pay the special assessment of $200 if you

21   have not already done so.

22         And Mr. Mercer, is there any reason to review the rest of

23   the standard and statutory conditions?

24              MR. MERCER:  No, Your Honor.

25              THE COURT:  Now, finally, as to the sentence, I will

1   enter the order of forfeiture and make it a part of the

2   sentence.

3        I think that completes the terms of the sentence.

4        Mr. Keaton, I know this has been a long journey here in

5   this Court, and some of that was because of the pandemic, some

6   of it was because your attorney requested a delay because of

7   Supreme Court rulings that might be coming down that could

8   perhaps have helped your case.

9        Regardless, here we are.  You understand, I believe, that

10  it was a serious offense particularly involving the guns,

11  drugs, and the presence of children, and so in light of your

12  past history, a sentence like this was necessary and

13  appropriate.

14       At the same time, as you heard, but for some technical

15  legal arguments, which luckily for you are now being accepted,

16  not necessarily every specific one, but arguments like the one

17  your attorney made have been adopted by the Fourth Circuit and

18  other Courts, not in every case exactly the same way and I

19  can't tell you whether this ruling will remain in place

20  throughout the life of this case, but but for those rulings on

21  technical legal issues, this sentence could have been much

22  higher.  At first blush, it certainly looked like a 15-year

23  mandatory minimum sentence.

24       And so hopefully you can reflect on the fact that you

25  have avoided that in this case and hopefully take that as a

1    sign that -- of good fortune where you can resolve to get on a

2    different path, use the time in prison and on supervised

3    release to address any drug-related issues, but more

4    importantly, also to get some job skills so that you can do

5    exactly what you said you would like to do, which is to come

6    back to society to work and be a part of your family's life.

7    And certainly if that's what you do, we all would encourage you

8    and it would be certainly for the best for your family and our

9    community.

10        But at the same time, you have seen how -- now that you

11   have this additional conviction, if you have another drug crime

12   or a gun crime, you almost certainly will be subject to a very

13   high sentence along the lines of those that you have heard

14   could have happened in this case and that would pretty much put

15   you behind bars for most of your productive years in the

16   future, so I hope what you said you plan to do is what you

17   actually do do.  Again, I think that would be what's best for

18   all of us, your family, our community.

19        But it's a difficult road, and so I hope that between you

20   and your family and the support that you can gain from them,

21   you can follow that path and not come back to the Court here

22   because it will be, unfortunately, even more draconian the next

23   time.

24        With that, you may be seated.

25        I should tell you that you generally have the right to

1  appeal your conviction and sentence subject to any waivers you

2  may have made in the plea agreement.  If there is a basis to

3  appeal and you wish to do so, you must file a notice of appeal

4  within 14 days of the entry of judgment.  If you request, the

5  clerk will prepare and file a notice of appeal on your behalf.

6  If you cannot afford to pay the costs of an appeal or for

7  appellate counsel, you can apply to have the Court waive the

8  filing fee and appoint counsel to represent you on the appeal.

9       Are there any remaining counts that have yet to be

10  dismissed, Mr. Hagan?

11           MR. HAGAN:  Your Honor, there was an indictment.  The

12  guilty plea was to a superseding information, so the government

13  will move to dismiss the original three counts in the

14  indictment.

15           THE COURT:  Okay.  That motion will be granted, and I

16  will adopt the portions of the plea agreement that deal with

17  dismissal of counts.

18       Is there anything else we should discuss while we are

19  here today?

20           MR. HAGAN:  Nothing from the government, Your Honor.

21           MR. MERCER:  Your Honor, if the Court could include a

22  recommendation for Cumberland, because I believe they have a

23  low security camp there, that would be appropriate.

24           THE COURT:  We can certainly make a recommendation

25  for Cumberland.  And I am reminded -- so I will include that in

1    the judgment.

2         Mr. Hagan, was there also a superseding indictment in

3    this case?  I think this might have been one of those cases

4    where we had a couple different documents, or am I thinking of

5    a different case?

6              MR. HAGAN:  The Court's indulgence.

7              THE COURT:  Paragraph 3 of the PSR refers to the

8    superseding indictment which I think we ended up not using.

9              MR. HAGAN:  That's correct, Your Honor.  On the 6th

10   of January, there was a superseding indictment with three

11   counts, and the government will move to dismiss that as well in

12   light of the plea to the superseding information.

13             THE COURT:  Okay.  So the -- both the original

14   indictment and the superseding indictment are dismissed.

15        Anything else from either side?

16             MR. MERCER:  Your Honor, just if the Court needed

17   those dates for the recommendation as far as credit for time

18   spent in state custody?

19             THE COURT:  How do they compare to what is on the

20   presentence report?

21             MR. HAGAN:  I don't believe I --

22             THE COURT:  Page 2.  They didn't do a total number,

23   but they gave dates.

24             MR. MERCER:  Let me just double check that.

25             THE COURT:  So he was detained from April 24th, 2020

1   to June 2nd, 2020.

2           MR. MERCER:  Yeah.

3           THE COURT:  Then there is an earlier period.

4           MR. MERCER:  Those were just the dates in federal

5   custody.  So the date for state custody was February 14th, 2018

6   to April 23rd, 2018, which was 69 days.

7           THE COURT:  I can't tell from this, Ms. Contreras,

8   whether -- would you agree that from the -- you have those

9   dates here, from February 14 to April 23rd.  It's not clear to

10  me from reading it whether he was in custody during that entire

11  period.  Do you know?

12          PROBATION OFFICER CONTRERAS:  Your Honor, it's our

13  understanding that he was in state custody then.  He didn't go

14  into federal custody until April 23rd.

15          THE COURT:  But then he was released.

16          PROBATION OFFICER CONTRERAS:  He was released for

17  April 24th until June 2nd and then -- so from April --

18          THE COURT:  What years are we referring to?  There is

19  so many dates here.

20          PROBATION OFFICER CONTRERAS:  I apologize.  So April

21  23rd, he was basically -- he was held from April 23rd, 2018

22  until April 24th, 2020.  He was released April 24th, 2020 and

23  was only out in the community for a couple of weeks, two weeks,

24  it looks like, and has been in custody since then.  So he's

25  been in federal custody from April 23rd, 2018 until April 24th,

1  2020, and then June 2nd, 2020 until today.

2              THE COURT:  So what I would like to do, and this is

3  -- I don't usually make recommendations on specific time unless

4  it's, A, very clear to me and it really just involves things

5  that I had a direct role in, so -- but I would ask,

6  Ms. Contreras, could you amend the presentence report there

7  just to clarify, to the extent you have the facts, not just the

8  dates, which are all there, but the periods when he was in

9  custody or not, on state charges or on federal charges.  I

10 think if that's clear from that, the BOP will easily be able to

11 determine the numbers that Mr. Mercer is proposing.  So can we

12 include that as an amendment to the PSR?

13             PROBATION OFFICER CONTRERAS:  Can you just clarify

14 what it is other than the dates that -- because we do list on

15 there that he was in custody for the state charges and then we

16 changed -- we listed that he was in federal custody after his

17 initial appearance.  What is it that you would like it to --

18             THE COURT:  Well, it just says he was arrested on the

19 14th.  It doesn't say whether he was bailed out or not.  So if

20 your records show that on February 14th, he was detained on

21 state charges, maybe it can say he was arrested and detained on

22 that date, and then --

23             PROBATION OFFICER CONTRERAS:  Okay.  I will clarify

24 that.

25             THE COURT: -- and then -- I mean, this doesn't

1    actually get into that period when he was released, you said,

2    for a couple weeks, but maybe that's -- that's the main part I

3    would focus on, and if you could just make that slight edit, I

4    think that will just make it more clear for the BOP and then

5    the calculations will be accurate.

6          Okay.  Thank you all very much.

7              MR. MERCER:  Thank you, Your Honor.

8          (The proceedings were concluded at 3:51 p.m.)

9

10                      - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX TO TESTIMONY

2

3     DEFENDANT'S WITNESSES:

4     BENJAMIN STREIFEL                                        PAGE

5         Examination by the Court                             9
          Direct examination by Mr. Mercer                    17
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2           I, Renee A. Ewing, an Official Court Reporter for

3    the United States District Court for the District of Maryland,

4    do hereby certify that the foregoing is a true and correct

5    transcript of the stenographically reported proceedings taken

6    on the date and time previously stated in the above matter;

7    that the testimony of witnesses and statements of the parties

8    were correctly recorded in machine shorthand by me and

9    thereafter transcribed under my supervision with computer-aided

10   transcription to the best of my ability; and that I am neither

11   of counsel nor kin to any party in said action, nor interested

12   in the outcome thereof.

13

14
            Renee A  Ewing
15
            Renee A. Ewing, RPR, RMR, CRR
16          Official Court Reporter
            June 3, 2022
17

18

19

20

21

22

23

24

25